Judges of the United States Court of Appeals for the Second Circuit, hear ye, hear ye, hear ye. All persons having business before this, a stated term of the United States Court of Appeals for the Second Circuit, God save the United States of America and this honorable court. Please be seated. Good morning, everyone. We have four argued cases on the calendar today. We have one case that's on submission, that's United States v. Devine, and we will take that case on submission. I have been told by our deputy that counsel is ready, present. Everyone's ready for argument in all four of the argued cases. So I'm going to dispense with reading the calendar this morning so we can get right to it. The first case is on rig Madoff. Good morning. May it please the court. My name is Matt Canigliaro. I am with Carlton Fields and I'm here today on behalf of the appellant in this case, R.A.R. The trial in this case featured the expert testimony of Mr. Dubinsky. The core of his testimony was a series of opinions that were never disclosed in his expert report. Prior to trial, when it became apparent to our side that he was going to give opinions on issues of ownership of the two bank accounts that were at issue, we objected and the trial court overruled the objection after the trustee insisted his opinions had been fully and completely disclosed. We objected again at trial. The court overruled the objection. We have, in the briefing, gone back and forth over whether those opinions were actually disclosed. And ultimately, the district court was misled. The opinion that the amended BD form and that the 2004 amended operating agreement effectuated a transfer of the bank accounts is nowhere to be found in his expert report. His expert report is 200 pages long and it never cites either of those documents. And yet, they became the focus of the trustee's position in this trial. It is essential that we be permitted to prepare. And in this case, because of the way things unfolded, we were not able to be prepared. The testimony from Mr. Dubinsky was extraordinary. He focused particularly on how he was testifying from an accounting perspective or from a forensic accounting perspective. And appreciating that, we also asked for leave belatedly to file a Dawbert motion challenging Mr. Dubinsky's testimony. He is a forensic accountant, but what he is not, as the trustee acknowledged in the Nelson case, what he is not is an expert in corporate form or trade names. And so, we asked belatedly for leave to file a motion to challenge him under Dawbert, and the court denied that, and that's sort of the second part of our first point. The first part is that there's no timing issue on the first part. We moved to exclude based on the opinions not being disclosed. That was just denied. The second part of our argument is we asked for leave to file a Dawbert challenge, and that was denied as untimely. And under the circumstances, as we've laid out in the briefs, we believe there was good cause. We did not know these opinions were coming from Mr. Dubinsky. And so, when the court studies the specific testimony that he gave, I think it becomes apparent, he actually wasn't testifying as a matter of law and ownership as much as he was testifying as a matter of accounting principles. He may be a very fine accountant who's very decorated, and he hedged, and we'll suggest he hedged on purpose. He hedged because what he was really doing was saying, as an accountant, when I look at these documents, this is what I see. I see there was a transfer. I see that in 2001, the sole proprietorship transferred not just the two legitimate divisions of Madoff's businesses, but the illegitimate business. And so, as a matter of- The argument is that this allowing his testimony is an abuse of discretion because you didn't have notice that he was going to talk about the two accounts? Because we did not have a report that explained what his testimony was, what his opinions would be, including the conclusion and the basis for them. Nothing in his report discusses ownership of these bank accounts. Nothing in his report mentions the two documents that became sort of the focus of the trial and the basis for Dubinsky's opinion. And that's where we assert that we should have been permitted not just to exclude him. He should have been excluded. We should have been permitted to challenge him under Dawbert that that's not his expertise, is looking at corporate form and determining that, based on these documents, there was an operative transfer. I guess I'm having difficulty seeing what's wrong with an accounting perspective on the issues that he testified to. Isn't it relevant that, from an accounting perspective, all the assets looking at these documents in his experience as an accountant would belong to this entity? I'll agree that, as an accountant, from an accounting perspective, there are aspects of it that certainly are relevant. If we're tracing funds and where they went, there's relevance there. But the issue was, who owned the bank accounts? And he was testifying not just to, as an accounting matter, where I see funds going from place to place, but to actual ownership. In fact, his testimony was that these two documents were the operative documents that effectuated the transfer. And when you read them, we'll suggest they don't. But really, what this argument is about is that we should have been permitted to challenge that, and none of this was noticed to us. What we would do under these circumstances is look for a competing expert who would challenge exactly that testimony. And we didn't do that, having not been told that's where he would be going with this. His 200-page report is an off-the-shelf report. It's been filed in case after case after case in this litigation. And our side appreciated that. We knew what was in the report. What was not in there was what this trial became about. And frankly, it was the sole issue or should have been the sole issue in this trial. So RAR's requests for transfers were directed to BLMIS, were they not? They were faxed to a fax machine. Sure, the fax cover page was directed to BLMIS. Yes. So why does it matter then where these accounts were if RAR in fact thought that BLMIS was the correct entity to direct this? There are multiple answers to that, Your Honor. First, the district court ruled that RAR's subjective views of who owned what were not relevant. And second, the actual fax transmittal forms said on their face that we'd like a withdrawal from our account with Bernard Madoff. They did not acknowledge in any way that the account was with the LLC. There's a couple practical layers. Is that like there were two businesses going on, that there was a Madoff business and then the BLMIS business? Or maybe more plausibly it was just all one entity under BLMIS? Well, we'll suggest there's an issue of fact there. One of the practical layers beneath all of this is that the two legitimate businesses, they were legit. The investment advisory business was not. Not only was it unregistered, it was, as we all now know, an incredible Ponzi scheme. Madoff didn't want that to be audited. And so he took extraordinary steps to essentially keep it hidden. And that's part of our theory of the case, is that he never transferred the investment advisory business, including these accounts, to the LLC. Because he was continuing to operate that in the same shadowy way he operated it all the years before the LLC was created. And so from our understanding as RAR, the LLC was a huge operation, massive operation. The fax machine that we were faxing to went to that huge operation. What we were saying, get this to the investment advisory business. And ultimately that should be a question of fact, not something to be determined in anything other than a fair trial with notice of what the expert opinions will be. I'll turn very briefly to the verdict form issue, because it frames really what we should be doing here. We went into this trial believing, based on the summary judgment order, including the district court's comments early in the trial, that we were trying the issue of ownership. We told the jury, the issue you will be asked, the only issue you will be asked to decide, is the issue of ownership. But the rules changed, the goalposts moved. It became about, well, if the business was transferred in 2001, that's enough. And the district court made very clear that, in the court's view, that answered the question. As a matter of law, if the business was transferred in 2001, then we know ownership of these accounts in 2008 or so. And we fundamentally disagree. The issue should have been ownership. The question of ownership should have been put to the jury. And respectfully, what the court should have done here is allowed that second question to go to the jury. And ultimately we believe that's the only thing that should have been asked and should have been dispositive. So the questions you proposed didn't start with that question. Admittedly, we tried in what, in hindsight, might be a little bit of a way to cut off needing to get there. If there hadn't been a transfer of the business, then we would say it was all done. But even if there had been, there's still the issue of ownership. So I appreciate my time. We ask the court to reverse. Thank you. Thank you. May it please the court. My name is Deirdre Farrell, and I am counsel for Irving Picard, trustee in this SIPA liquidation. I will be answering or responding, rather, to RIR's arguments. My colleague, Mr. Kelly from SIPIC, will be discussing customer property and how that plays into this litigation. I'd like to start with RIR's arguments related to Mr. Dubinsky's testimony. Just to correct the record a little bit. So there were two objections to Mr. Dubinsky's testimony in the district court below. There was one following summary judgment where the district court permitted the parties to write a letter as to whether or not the parties should be granted leave to object to Mr. Dubinsky's testimony. That was denied. Later on the eve of trial, RIR filed a motion in limine. And they specifically said it was not on the Daubert line of cases, but it was based on Rule 26 disclosure. With regard to Rule 26 disclosure, the trustee would submit that the disclosure was proper in this case. In particular, we would direct the court to look at the cases cited by the trustee on page 41 of our brief, Harkabi v. Sandisk and Inree Payment. Both of those cases, Harkabi is a Southern District case. Inree Payment is an Eastern District case. In Harkabi, the court states that the expert's report need not replicate every word that the expert might state on the stand. Rather, it should convey the substance of the expert's opinion. That case also discusses how courts in this district or in the Southern District understand that an expert can offer evidentiary detail at trial, which elaborates on their report that was submitted earlier. In fact, that case says that testimony should only be precluded based on nondisclosure only when it expounds a wholly new and complex approach designed to fill a significant and logical gap in the first expert report. Inree Payment talks about how the expert's testimony should be able to supplement, elaborate upon, explain, and subject himself to cross-examination. That's what we would submit happened in this case. Mr. Dubinsky's report, as my opponent mentioned, Mr. Dubinsky was the primary expert for the trustee in this massive fraud. He conducted a huge analysis, produced this report that exceeded over 200 pages. It detailed the nuances of this very large Ponzi scheme. In that report, Mr. Dubinsky, in paragraph 36, discusses how BLMIS was originally founded as a sole proprietorship in 1960. It was comprised of three business units, one of which was the investment advisory business that the fraud was conducted through. In paragraph 38, he discusses that the sole proprietorship was converted into an LLC in 2001. The report also discusses how he conducted, excuse me, in paragraph 14 of Dubinsky's report, he talks about how he conducted a full analysis of the BLMIS bank accounts. In paragraphs 29, 41 through 45, he discusses how the investment advisory business ran the fraud. And in paragraphs 77, 337, and 340, he discusses how the investment advisory business perpetrated the fraud through the 509 and the 703 bank accounts that are at issue in this. But there's no place, and correct me if I'm misunderstanding this, but there's no place where he offers the opinion as to who, as to what, these two accounts, to whom they belonged. You're right, Your Honor. There is not a single sentence in the report that explicitly states, in 2001, when the business was transferred from a sole proprietorship to an LLC, that all of the assets, including these two specific bank accounts, were transferred as well. What we would submit is that isn't an evidentiary detail that Mr. Dubinsky elaborated on once it became clear that that was the focus of this trial. And the whole point of the Rule 26 disclosures is to avoid an ambush by trial, and that's simply not what happened here. The Form BD was originally submitted not as part of Mr. Dubinsky's report, but it was rather it was submitted at the same time as an exhibit to a declaration on summary judgment briefing. It was attached to the trustees' briefings in summary judgment. So it wasn't like some surprise, last-minute document that was pulled out of nowhere. Same thing with the amended and restated operating agreements. Those were produced to the appellant well before a trial, and the trustees' report does cite to the Articles of Organization, which established the LLC in 2001, and the original Form BD. So just to make sure I understand it, so the argument is that his report, the thrust of it was that all of the assets came over from the sole proprietorship when it was converted to an LLC, and then during trial it became apparent that the focus was on the two J.P. Morgan accounts, and so that's why it wasn't an ambush. It was, in fact, digging into specific accounts that were sort of grouped into the overall thrust of the report. Is that right? Yes, I would say that. I would just add that it became clear at the end of the summary judgment phase, which was in I think it was like June 2020, and that trial wasn't until March 2022. The point is the issue became clear at the end of summary judgment, and there was a long and significant time period between when the trial occurred. It was certainly not a last minute. These documents were produced, and then he testified to them. I would just like to also address the issue of whether Mr. Dubinsky was qualified to testify as an expert in this case. As the court is well aware, district courts have broad discretion in their gatekeeping role in whether to admit an expert witness. Mr. Dubinsky testified how he holds a number of certifications. Foremost, of course, is he's a certified public accountant. He's a certified fraud examiner. He's certified in financial forensics. The list goes on in the testimony. He describes all of the experience he has. I think the court touched on this a little bit with my opponent. Mr. Dubinsky testified that as a CPA, when he ran his own firm, a large part of his business was advising his clients about formation of businesses, which types of businesses they should form, what were the implications of the various business forms, and that's very much the bread and butter of a CPA. It's not the common misconception that a CPA only does taxes. That's not true, and he explained that in his testimony. He also stated that it's a foundational part of his being a certified fraud examiner. When you're going in and you're examining a fraud, the type of business, the form of business, is a foundational element that you look at to see what implications that has on the fraud. We would submit that Mr. Dubinsky was properly admitted as an expert, and in fact, when the court admitted him as an expert, he turned to the jury and reminded them that Mr. Dubinsky, like any other evidence presented in the trial, his opinion, it was up to the jurors to decide the weight of the opinion that was given. If you have nothing further. Can I just ask one quick question? Yeah, of course. How many other cases are out there like this where they depend on whether the transfers were made by the LLC or the sole proprietor? Because it seems like there's a significant waste of resources going on when the same issue is popping up again and again. We would agree, Your Honor. How many are remaining? I'm not sure. This is one of the last, if not the last, good faith defendant case in the Madoff litigation. As Judge Furman's decision denying the motion for judgment of law stated, he brought up a number of cases that have been denied on this very same issue. Of course, I can't find that quote right now, but he mentions it's Nelson, it's Epstein, it's Jabba, it's Nissenbaum. There's a number of them, and Judge Furman references them all when he was denying the motion for judgment as a matter of law. Thank you. Good morning, and may it please the Court. Nathaniel Kelly for the Securities Investor Protection Corporation. The defendant here takes issue with the jury verdict form, which ended the jury's inquiry after a finding that Madoff's fraudulent investment advisory business was transferred to Bernard L. Madoff Investment Securities LLC when it was formed in 2001. As the district court correctly explained, this transfer means that the sole proprietorship ceased operations and its assets, including the J.P. Morgan accounts through which it ran the fraud, were owned and controlled by the LLC. But importantly, for protection under SIPA, a finding that the investment advisory business was part of the SIPA member LLC settles the matter. Doing otherwise would give legal effect to Madoff's machinations. Four interlocking reasons establish the trustee's right to recovery. First, as Jabinski's expert opinion makes clear, this was all one fraud conducted through the investment advisory arm of Madoff's continuous SIPA member brokerage firm, now subject to the liquidation and protection under SIPA. Madoff registered his brokerage firm with the SEC as a sole proprietorship in 1960. It became a SIPIC member in 1970 upon the enactment of SIPA. And in 2001, Madoff amended his broker-dealer registration to change his corporate form to an LLC, As required by the SEC to ensure that no liabilities or customer obligations are left behind and unprotected, the amended registration certified that all assets and liabilities were transferred to the LLC. As the jury found, this included the IA business. Second, investment advisor clients, such as the defendant who opened securities accounts with BLMIS, were customers of BLMIS. As of 2001, all the sole proprietorships, IA customers, became customers of the LLC. Third, the customer deposits into the JP Morgan accounts are customer property protected under SIPA. Customer property under SIPA is expansive, including cash and securities received, acquired or held by or for the account of a debtor from or for the securities accounts of a customer, including stolen customer property and property which should have been properly custodied but was not. Customer property can include cash intended for deposit with the debtor, even if misdirected to accounts not owned by the debtor, or property that is not properly custodied by the debtor and is held outside of customer accounts. Here, funds, including the defendant's funds, were entrusted to BLMIS, first as a sole proprietorship and then as an LLC, for investing in the securities markets. They were deposited and commingled in the JP Morgan accounts, and customer withdrawals were satisfied from the JP Morgan accounts. The JP Morgan funds are customer property, regardless of whether they were properly segregated, and the trustee and CIPIC have treated them as such and protected them as such. Fourth, the recovery of fraudulent transfers for pro rata distribution to customers is part of SIPA's protection. SIPA enables the recovery of fraudulent transfers which would have been customer property but for the transfer, and as if it had been property of the debtor. Here, the fraudulent transfers received by the defendants from the JP Morgan account consist of stolen customer property recoverable by the trustee. Unless the court has any questions, SIPA progresses. Thank you. Thank you, Your Honor. That is their theory of the case. Our theory of the case is extremely different. There were many of these cases over time. Very few have been tried, and each defendant is entitled to defend itself and to have the rules of procedure followed. In this case, that didn't happen. Counsel suggested that it's really just about conveying the substance. Well, actually, the rule itself is extremely clear. The rule requires a complete statement of all opinions an expert witness will express and the basis and reasons for them, along with the facts or data considered in forming those opinions and exhibits that will be used to support them. The entire trial became about two documents. There were more, of course, but when you look at it, these were the features. Everything else just sort of supported where Dubinsky went from these two documents, the operative documents. None of that was discussed in this report. What happened in this case was the trustee got surprised by the summary judgment ruling. He had two experts he'd lined up and said, I now need to have a trial over who owned the bank accounts. Dubinsky said, I'm just going to try to fit a square peg in a round hole and went with that. That's what happened. It was a surprise to us. We sat there at trial and heard opinions we'd never heard before. Ultimately, that's what made this trial unfair. We asked the court to reverse. We asked the court to direct that there be, at a minimum, a new trial with an opportunity for us to present our own expert testimony, challenge the testimony. You've had the expert report since, what, June 2019? Yes. In the summary judgment motion, the ruling made clear what the issue of the trial was going to be, but you were still surprised when the expert offered the testimony that he offered because this particular specific issue was not articulated precisely in the 200-page report? I'll answer with a candid yes, but it's more than that, though. This was the entire trial. Which you knew going in. Absolutely. But we also knew what Dubinsky's breadth was, and his breadth was not to go in and talk about how, when I read the amended BD form, I see this effectuated a transfer. It's, with all respect and candor, you can't get that from this report. You just couldn't. So we knew there would be this issue. What we didn't know was that they could come in and present that testimony from him. That's what happened. It was unfair. We asked the court to reverse. Thank you. Thank you all, and we'll take the matter under advisement.